LYNN M. DEAN (Cal. Bar No. 205562)
Email: deanl@sec.gov
AMY JANE LONGO (Cal. Bar No. 198304)
Email: longoa@sec.gov
COLLEEN M. KEATING (Cal. Bar No. 261213)
Email: keatingc@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Katharine E. Zoladz, Associate Regional Director
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> MOHAMMED PITHAPURWALA, AMMAR KUTIYANAWALLA, and ALIFIYA KUTIYANAWALLA, <br><br> Defendants. | Case No. 2:21-cv-9384 <br><br> **COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.      Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national

securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.     Venue is proper in this district pursuant to Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.

## SUMMARY

4.     This SEC enforcement action involves unlawful insider trading in the securities of Snap Inc. ("Snap") by defendant Ammar Kutiyanawalla ("Ammar") ahead of Snap's February 2018 positive earnings release based on a tip from his brother-in-law, defendant Mohammed "Mo" Pithapurwala ("Pithapurwala"), who was a lead engineer at Snap.

5.     In January 2018, Pithapurwala had access to material non-public information concerning Snap's fourth quarter and year-end 2017 financial results. Knowing he was prohibited from trading in Snap securities during the blackout period and from trading Snap options at any time, Pithapurwala asked Ammar to purchase Snap options.  Pithapurwala and Ammar agreed to share the profits from Ammar's trading.

6.     Pithapurwala and his wife, Alifiya Kutiyanawalla ("Alifiya"), Ammar's sister, funded the trading by surreptitiously transferring $20,000 to Ammar through intermediaries, in multiple transfers over the course of a week.

7.     On February 5 and 6, 2018, just before Snap's results were to be announced, Ammar purchased $24,039.67 of short-dated, out-of-the-money Snap call options based on Pithapurwala's tip.  The trading was highly unusual for Ammar, who had never previously purchased any Snap securities and had only limited experience trading options.  The options were set to expire shortly, and at the time of Ammar's purchase, the strike price was higher than the current market price for Snap's common stock.  If Snap's share price did not rise before the options'

expiration, Ammar would lose his entire investment.

8.      After markets closed on February 6, 2018, Snap announced earnings results that beat market analysts' expectations, causing its stock price to rise 48% the next day.  Ammar sold all the options on February 7 and 8, 2018, realizing profits of $261,515.78 – a 1088% return in just three days.

9.      By engaging in the conduct alleged in this Complaint, Pithapurwala and Ammar violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Alifiya aided and abetted their primary violations.

10.      The SEC seeks findings that Defendants committed the above violations, and final judgments: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendant Ammar Kutiyanawalla to disgorge all ill-gotten gains he received as a result of the violations alleged and to pay prejudgment interest thereon; (c) ordering Defendants Pithapurwala and Ammar Kutiyanawalla to pay civil money penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1], and ordering Defendant Alifiya Kutiyanawalla to pay a civil money penalty pursuant to Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and (d) ordering any other and further relief the Court may deem just and proper.

## THE DEFENDANTS

11.      **Mohammed Pithapurwala**, age 39, resides in Woodside, California.  During the relevant period, he resided in Los Angeles, California.  Pithapurwala was a lead engineer at Snap from April 2015 until March 2018.  He is married to defendant Alifiya Kutiyanawalla.

12.      **Ammar Kutiyanawalla**, age 35, resides in India.  During the relevant period, he resided in Augusta, Georgia and was unemployed.  Ammar is Alifiya's brother and Pithapurwala's brother-in-law.

13.      **Alifiya Kutiyanawalla**, age 32, resides in Woodside, California.  During the relevant period, she resided in Los Angeles, California.  She is married to

defendant Pithapurwala.

## RELATED INDIVIDUALS AND ENTITY

14.    Snap Inc. is a Delaware corporation with its headquarters in Santa Monica, California.  Its common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the NYSE under the symbol "SNAP," and its options trade on various exchanges.

15.    Mr. A, a friend of the Kutiyanawalla family, resides in Summerville, Georgia and operates his own business, a convenience store.  Mr. A first met the Kutiyanawalla family in India before he moved to the United States in 2014.

16.    Mr. B, a friend of Mr. A's and Mr. C's, resides in Rome, Georgia.  He knows Ammar's father and formerly worked with Mr. A's father.

17.    Mr. C is a friend of the Kutiyanawalla family and Mr. A's uncle.  He resides in Summerville, Georgia and owns a number of businesses, including two motels, four convenience stores, and a car wash.  At various times, Mr. C employed Mr. A and Mr. B at one of his convenience stores.

18.    Mr. D resides in Augusta, Georgia and has been a friend of Ammar's since approximately April 2014.  Mr. D and Ammar were roommates from approximately July 2014 to December 2015.  Mr. D was previously a research scientist and is now an assistant professor at the Georgia university where Ammar was formerly employed.

19.    Ms. E resides in Augusta, Georgia and has been a friend of Ammar's since about 2015.  Ms. E is a research assistant at the Georgia university where Mr. D also works, and where Ammar was previously employed.  From approximately 2015 to 2018, Mr. D and Ms. E were in a romantic relationship and lived together.

20.    Alifiya and Ammar Kutiyanawalla's parents (the "Kutiyanawalla parents") reside in Mumbai, India.  The Kutiyanawalla parents visit the United States occasionally, and were in the United States from approximately December 2017 to May 2018.  While visiting the United States, they have stayed in Summerville,

Georgia at one of Mr. C's motels and also in a spare room at Mr. A's house.

## THE ALLEGATIONS

### A.    The Defendants' Close Family Relationship

21.    Pithapurwala and Alifiya were married in 2011, and from at least April 2015 to about June 2017 and from December 2017 to June 2018, they resided together in Los Angeles.

22.    Ammar resided in Augusta, Georgia from at least 2012 to December 2019.  Since approximately December 2019, he has lived in Mumbai, India, where his and Alifiya's parents reside.

23.    Alifiya and her brother Ammar had a close relationship during the relevant period, and Ammar and Pithapurwala had a close relationship as brothers-in-law.

24.    In 2017 and 2018, Alifiya and Ammar communicated daily or every other day.

25.    Pithapurwala also communicated frequently with Ammar in 2017 and 2018.

26.    In December 2017, Pithapurwala brought Alifiya, Ammar and Ammar's then girlfriend to Snap's New Year's Eve party in Los Angeles, as his guests.

27.    During the relevant period, Alifiya, Pithapurwala, and Ammar shared Amazon, Netflix, and Hulu accounts, as well as an AT&T wireless family plan that they continue to share.

28.    Pithapurwala and Alifiya temporarily relocated to Canada in approximately June 2017 for approximately six months as part of Pithapurwala's employment at Snap.

29.    During that time, they used Ammar's residential address in Augusta, Georgia as their mailing address, including for documents such as bank statements, tax materials, and Snap payroll information.

30.    Ammar designated Alifiya as the payable-on-death beneficiary for

certain of his bank accounts.

**B.   Pithapurwala's Duty of Confidentiality to Snap**

31.   In or about April 2015, Pithapurwala began working as a lead engineer at Snap.

32.   As an employee, Pithapurwala owed Snap a duty of trust and confidence, including a duty to maintain the confidentiality of its non-public information.

33.   On or about February 26, 2015, as a condition of his employment, Pithapurwala signed an agreement (the "confidentiality agreement") obligating him to protect Snap's confidential information, including, among other things, financial information.

34.   As a Snap employee, Pithapurwala was subject to Snap's insider trading policy.

35.   Snap's insider trading policy during the relevant period expressly prohibited employees from using material non-public information, including financial results or forecasts, for personal gain or passing such information to someone else who would use it for personal gain.

36.   Snap's insider trading policy during the relevant period stated that: "Because our workplace culture tends to be open, odds are that the vast majority of Snap Inc. employees, directors, and consultants will possess inside information at certain points throughout the year."

37.   Pursuant to Snap's insider trading policy, all Snap employees, directors, and consultants were prohibited from trading the company's securities during quarterly blackout periods preceding earnings releases.

38.   Additionally, Snap's insider trading policy prohibited all employees, directors, and consultants from trading Snap derivatives, including call options, at any time.

39.   An appendix of "Frequently Asked Questions" to Snap's insider trading policy stated that trading in derivatives was prohibited "because of the temptation it

represents to try to benefit from a relatively low-cost method of trading on short-term swings in stock prices, without actually holding the underlying common stock, and encourages speculative trading."

40.    Snap's insider trading policy expressly prohibited tipping material non-public information to others, and the appended "Frequently Asked Questions" stated that telling someone to buy or sell Snap securities even without sharing inside information itself "is still tipping, and you can still be responsible for insider trading. You should not recommend to another person that they buy, hold, or sell our common stock or any derivative security related to our common stock, since that could be a form of tipping."

41.    Snap's insider trading policy also stated that:  "[T]here is one important factor to determine whether non-public information you know about a public company is inside information: whether sharing the information would likely affect the market price of that company's stock or be considered important or 'material' by investors who are considering trading that company's stock.  If the information makes you want to trade, it would probably have the same effect on others."

42.    Snap also conducted training on insider trading, which Pithapurwala completed on March 25, 2017.

43.    During the relevant period, Pithapurwala received multiple emails concerning Snap's insider trading policy, including as to the blackout period in effect as to Snap's fourth quarter and year-end 2017 financial results.

44.    For example, on or about October 17, 2017, Pithapurwala received an email from Snap's stock plan administrator stating that Snap's employee trading window prior to the announcement of its fourth quarter and year-end 2017 results would close at the end of the day on December 8, 2017.  The email included a hyperlink to Snap's insider trading policy and instructed recipients to review the policy "to brush up on the rules regarding trading Snap stock."

45.    As another example, on or about December 5, 2017, Pithapurwala

received an email reminder from Snap's in-house counsel that the trading window prior to the release of Snap's fourth quarter and year-end 2017 results would close on December 8, 2017.  The email reiterated that employees were not permitted to trade Snap derivatives, including call options, at any time.  It also stated: "During the closed window, not only are you forbidden from buying or selling Snap stock, but you also may not instruct others to buy or sell Snap stock."  Employees were encouraged to contact Snap's in-house counsel if they had any questions.

46.     After close of business on December 8, 2017, the blackout period began, prohibiting all Snap employees from trading in advance of Snap's fourth quarter and year-end 2017 financial results, pursuant to the insider trading policy.

47.     On or about January 8, 2018, Snap's in-house counsel provided a reminder to all employees of Snap's insider trading policy.

48.     On or about January 9, 2018, Pithapurwala received another email from Snap's in-house counsel reminding him of the blackout period that was in place and including a link to Snap's insider trading policy.  The January 9, 2018 email stated that Snap would announce its fourth quarter and year-end 2017 financial results on February 6, 2018.  The email also stated that financial results and metrics were confidential, and warned that violating insider trading laws could result in "both monetary and criminal consequences."

49.     On January 19, 2018, Pithapurwala received another reminder of the trading blackout window and Snap's insider trading policy from Snap's stock plan administrator, including a hyperlink to the policy.

50.     Pithapurwala was aware of Snap's insider trading policy, including the prohibition on trading Snap securities during the blackout period.

51.     During the SEC's pre-filing investigation, Pithapurwala admitted that he was aware of Snap's insider trading policy, including the prohibition on trading during the blackout period.

**C.    Pithapurwala's Access to Snap's Material Non-public Information**

52.    At all relevant times, Snap had an open culture, both in terms of physical work space and employee access to information.

53.    During the relevant period, Snap's offices where Pithapurwala worked included a number of bungalows and other former residential buildings in Venice, California.

54.    Nearly every individual at Snap's Venice offices shared a working space with multiple desks in it.

55.    Shared printers were centrally located in Snap's Venice offices.

56.    Many Snap employees printed hard copies of revenue estimates and other financial information, and did not always dispose of them using shredders.

57.     Discussions of financial information by Snap's finance team and others with regular access to such information were not limited to closed-door meetings.

58.    From April 2015 until approximately May 2017, Pithapurwala was the lead engineer in charge of building Snap's internal "Ad Manager," a system for creating and tracking advertising campaigns within Snap.

59.    Ad Manager housed and displayed material non-public information, including the dollar amount that an advertiser was obligated to pay Snap in connection with an advertising campaign.  Ad Manager reflected the number of "impressions," or the number of user views of an ad, which translated to ad dollars.

60.    During the relevant period, advertising sales were the primary source of Snap's revenue, representing approximately 98% of 2017 fourth quarter revenues.

61.    Based on the foregoing, an individual with access to Ad Manager could calculate a rough revenue estimate for Snap using non-public financial information available in Ad Manager and related systems.

62.    In or about May 2017, Pithapurwala moved to another Snap engineering team; however, he retained access to Ad Manager through at least November 2017.

63.    In or around December 2017, Pithapurwala was assigned, at his request,

to Snap's 100 Market Street building, also in Snap's Venice location, which housed the company's chief financial officer, accounting, tax, financial performance and analysis, investor relations, and treasury teams.

64.     Snap's accounting close process for fourth quarter and year-end 2017 began on or about January 2, 2018.

65.     On or about January 4, 2018, Snap's preliminary revenue estimate for fourth quarter and year-end 2017 was distributed to at least 15 employees, including finance team members.

66.     The preliminary revenue estimate was distributed via email and not password-protected.

67.     On January 9, 2018, Snap announced that it would report its fourth-quarter 2017 earnings on February 6, 2018.

68.     Snap's financial statements for the fourth quarter and year-end 2017 did not materially change after January 12, 2018.

69.     Between January 4 and 17, 2018, Snap's pre-earnings results were distributed to dozens of officers, directors, and employees in advance of Snap's February 6, 2018 earnings release.

70.     Because of Snap's open culture and his proximity to the financial team, Pithapurwala had access to Snap's material non-public financial information.

71.     In January 2018, Pithapurwala had access to material non-public information concerning Snap's pre-earnings results.

**D.     Ammar's Background and Trading History**

72.     From at least March 2016 to January 2017, Ammar worked as a research assistant at a Georgia university.

73.     As of January 2018, Ammar had been unemployed for a year and had no other regular source of income.

74.     In January 2017, Ammar reported to his broker-dealer ("Broker") that he had assets of less than $25,000.

75.     Prior to February 2018, Ammar had never purchased more than one or two option contracts at a time.

76.     Prior to February 2018, Ammar had never traded any Snap securities.

**E.     Pithapurwala Asks Ammar to Trade Based on Snap's Expected Results**

77.     In January 2018, after gaining access to material non-public information regarding Snap's financial results, Pithapurwala asked Ammar to purchase Snap securities since he could not do so himself during the blackout period.

78.     Ammar and Pithapurwala agreed to share the profits from Ammar's Snap trading.

79.     Throughout the relevant period, Pithapurwala communicated with Ammar using Alifiya's phone.

80.     Alifiya and/or Pithapurwala, using Alifiya's phone, had calls with Ammar on January 4, 5, 7, 8, 10, 11, 14, 16, 17, 18, 22, 23, 27, 28, and 30, and February 1, 4, 5, and 7.

81.     These calls included:  a 20-minute call on January 5; a 21-minute call on January 7; a 20-minute call on January 14; a 16-minute call on January 16; a 42-minute call on January 28; and a 48-minute call on January 30.

82.     During one of more of these calls, Pithapurwala asked Ammar to purchase Snap securities on the basis of material, non-public information that he had learned regarding Snap's upcoming fourth quarter and full year 2017 earnings release.

83.     Pithapurwala logged into his brokerage account on or about January 22, 2018 and February 5, 2018, and researched pricing on Snap call options.

**F.     Pithapurwala and Alifiya Covertly Fund Ammar's Trading Account**

84.     Between January 24, 2018 and January 31, 2018, Pithapurwala and Alifiya transferred $20,000 to Ammar through a series of more than eight cash withdrawals, deposits, and transfers through intermediaries, depicted visually as such:

11

85.     Specifically, on January 24, 2018 at 2:03 p.m. Pacific time, Alifiya called Mr. C and they talked for 6 minutes – the first time they had spoken by telephone since October 2017.  Mr. C then called Mr. A, his nephew, and they spoke for 6 minutes.

86.     Next, Mr. A called Alifiya at 2:17 p.m. Pacific time, and they talked for 3 minutes – the first time they had spoken since December 2017.  Immediately afterwards, Alifiya called Pithapurwala, and Mr. A called Mr. C.  At 3:44 p.m. Pacific time, Alifiya called Mr. A, and they spoke for two minutes.

87.     At 4:36 p.m. Pacific, Pithapurwala and Alifiya withdrew $8,000 cash from their joint bank account at Bank 1.

88.     The next day, January 25, 2018, at 2:21 p.m. Pacific time, Alifiya deposited $9,000 cash into an account at Bank 2 which was titled solely in her name.

89.     Immediately after depositing the cash, Alifiya initiated an $8,000 same-day wire transfer to Mr. A.

90.     At 3:41 p.m. Pacific, Pithapurwala, accompanied by Alifiya, withdrew $12,786 cash from his account at Bank 3.

91.     At 4:21 p.m. Pacific, Alifiya deposited $12,700 cash into her account at Bank 2, at a location different from the branch where she had made the $9,000 cash deposit two hours earlier.

92.     That evening, at 6:18 p.m. Pacific time, Alifiya called Mr. A, and they spoke for four minutes.  Alifiya and Mr. A never spoke again for the rest of the year.

93.     On or about January 26, 2018, Alifiya flew from Los Angeles to San Francisco for a one-day trip that she had booked several days earlier.

94.     While in the Bay Area, Alifiya went to a Bank 2 location and initiated two same-day transfers: a $6,000 wire to Mr. A and a $6,000 wire to Mr. A's and Mr. C's friend, Mr. B.  At or around the time that she made the transfers, Alifiya had four calls with Mr. C, the longest of which was four minutes.

95.     Alifiya made each of the transfers at Pithapurwala's request because he did not want to be associated with them.

96.     On or about January 27, 2018 at 12:46 p.m. Pacific time, Ammar texted Alifiya in Gujarati, "paisa nu su che," which translates:  "what is about money."  At 1:26 p.m. Pacific, Alifiya called Ammar, and they spoke for eight minutes.

97.     Mr. A and his uncle, Mr. C, both operate convenience stores with ATMs that they stock with cash, and therefore had ready access to cash during the relevant period.

98.     Prior to January 28, 2018, Mr. A, Mr. C, and/or one or more of their family members gave $20,000 cash to Alifiya's and Ammar's parents, who were visiting the United States from India and staying in Summerville.

99.     On or about January 29, 2018, Alifiya's wire to Mr. B was reversed because she provided information that did not match the full name on his account.

100.    Alifiya called Mr. C twice on January 30, 2018.  After speaking with him for three minutes at 2:16 p.m. Pacific, she immediately called Pithapurwala, and they spoke for four minutes.

101.    Alifiya called Mr. C twice on January 31, 2018.  On or about January 31, 2018, immediately after speaking with Mr. C by phone, she initiated a new $6,000 same-day wire to Mr. B, to replace the one that had been reversed.

102.    On or about January 28, 2018, Ammar drove to Summerville to pick up the cash from the Kutiyanawalla parents.  That evening, Alifiya/Pithapurwala, using Alifiya's phone, called Ammar, and they spoke for 42 minutes.

103.    On or about January 30, 2018, Ammar asked two friends, Mr. D and Ms. E, to each deposit $5,000 cash into their respective bank accounts and write him a

check for that amount, and they agreed to do so.

104.    The same day, Ammar deposited $5,000 cash into his Bank 1 account.

105.    The same evening, Ammar and Alifiya/Pithapurwala, using Alifiya's phone, had a 48-minute phone call.

106.    On or about February 1, 2018, Ammar transferred $4,000 from his Bank 1 account to his brokerage account.

107.    Also on February 1, Ammar deposited the two $5,000 checks from Mr. D and Ms. E into his account at Bank 4, which was affiliated with Broker.

108.    As of February 5, 2018, the checks had not cleared.  That morning, Ammar contacted Broker, expressing an urgent desire to move funds – the $10,000 in check deposits – from his Bank 4 account to his brokerage account.

109.    As an alternative, Ammar requested "a temporary increase in my margin for buying options," which was denied by the brokerage firm.

110.    Ammar then initiated a $9,500 transfer from Bank 4 to his brokerage account and called Bank 4 to discuss the check hold.

111.    After getting off the phone with the bank, at 9:40 a.m. Eastern time, Ammar telephoned Alifiya but got her voicemail.  He called her again immediately, and they spoke for less than a minute.  He tried calling her again at 9:57 a.m., but again got her voicemail.

112.    On or about February 6, 2018, Ammar deposited another $5,000 cash into his Bank 1 account and initiated a $4,999 transfer to his brokerage account.

113.    Defendants structured the transfer of funds to Ammar through these intermediaries and eight different withdrawals, deposits and transfers over a one-week period in order to conceal the source of the funds that Ammar used to purchase Snap securities, and evade detection.

**G.    Ammar Purchases Snap Call Options on the Basis of Material, Non-Public Information**

114.    A call option gives the holder the right, but not the obligation, to

purchase the company's stock at a set price (the "strike price") within a specified time period.  Generally, the buyer of a call option anticipates the stock price will increase during the specified amount of time.  If the strike price is above the price at which the underlying stock is then trading, the call option is considered to be "out-of-the-money" because it would be unprofitable to exercise the call and pay more for the stock than if it were purchased on a stock market.

115.   Ammar began placing purchase orders for Snap call options at 10:26 a.m. Eastern time on February 5, 2018 (the day before Snap's fourth quarter and year-end 2017 earnings announcement).  He continued to place purchase orders throughout the day.

116.   That afternoon, Pithapurwala logged into his own brokerage account and researched pricing on Snap call options, including calls with strike prices of $15 and $16 expiring on February 9, 2018.

117.   At or about 2:18 p.m. Eastern time, Pithapurwala called Ammar using Alifiya's phone, and they talked for 30 minutes.  During that call, Pithapurwala continued his pricing research, and Ammar placed two additional purchase orders for Snap calls.

118.   Shortly after that call, Ammar placed another purchase order for Snap calls at or about 2:58 p.m. Eastern.

119.   At or about 3:28 p.m. Eastern, Alifiya or Pithapurwala, using Alifiya's phone, called Ammar, and they spoke for two and a half minutes.

120.   At or about 3:57 p.m. Eastern, Ammar placed another purchase order for Snap calls.

121.   At or about 6:27 p.m. Eastern, Ammar called Alifiya's phone and spoke to her and/or Pithapurwala for approximately two minutes.

122.   The next day, approximately one hour before markets closed on February 6, Ammar placed purchase orders for an additional 475 Snap call options, of which 413 filled.

123. In total, Ammar purchased $24,039.67 of call options with February 9 and 16 expiration dates and strike prices of $15 to $18:

| Trade Date | SNAP Option Series | Quantity Bought |
|---|---|---|
| February 5, 2018 | February 9, 2018 $17 calls | 100 |
| February 5, 2018 | February 9, 2018 $16.50 calls | 100 |
| February 5, 2018 | February 9, 2018 $16 calls | 400 |
| February 5, 2018 | February 9, 2018 $15 calls | 50 |
| February 6, 2018 | February 16, 2018 $17 calls | 138 |
| February 6, 2018 | February 16, 2018 $18 calls | 275 |
| | Total | 1,063 |

124. Snap's common stock closed at $13.85 on February 5, 2018 and $14.06 on February 6, 2018.

125. All of the options Ammar purchased were out-of-the-money, meaning that he would lose his entire investment unless Snap's common stock price rose higher than the strike price – $15 to $18, depending on the options series – in 4 days, in the case of the calls expiring February 9, 2018, or in 10 days, in the case of the calls expiring February 16, 2018.

126. Ammar's trading was highly unusual in light of his prior trading history.

127. Ammar had never purchased more than 1 or 2 options at a time, and he had never purchased any Snap securities before.

**H.    Ammar's Sales of Snap Options and Profits from His Trading**

128. On February 6, 2018, after the markets closed, Snap released its fourth-quarter and full-year 2017 earnings, announcing results that beat expectations, including a 72 percent revenue increase over the prior year.

129. At 4:15 p.m. Eastern time on February 6 – the time of Snap's earnings announcement – Ammar called Alifiya's phone and reached her voicemail.

130. He tried to unsuccessfully to reach her again at 4:19 p.m.

131. At 4:41 p.m. Eastern time, Ammar texted Alifiya, "Ok good."

132. On the positive earnings news, Snap's share price rose 48%, closing at $20.75 on February 7, 2018.

133. Ammar sold all of the Snap options on February 7 and 8, 2018, realizing

profits of $261,515.78:

| Sale Date | SNAP Option Series | Quantity Sold | Profit |
|---|---|---|---|
| February 7, 2018 | February 16, 2018 $18 calls | 275 | $23,260.62 |
| February 7, 2018 | February 9, 2018 $15 calls | 50 | $17,466.78 |
| February 7, 2018 | February 9, 2018 $16.50 calls | 100 | $27,451.65 |
| February 7, 2018 | February 9, 2018 $16 calls | 400 | $135,785.87 |
| February 7, 2018 | February 9, 2018 $17 calls | 100 | $23,251.75 |
| February 8, 2018 | February 16, 2018 $17 calls | 138 | $34,299.11 |
| | Total | 1,063 | $261,515,78 |

134.   By his trading, Ammar garnered a 1088% return in three days.

**I.      Pithapurwala and Ammar's Post-Trading Communications**

135.   After Ammar sold his Snap options, Pithapurwala and Ammar attempted to manufacture a false explanation for Ammar's Snap trading because they knew it appeared suspicious.

136.   On or about February 8, 2018, Pithapurwala texted Ammar from Alifiya's phone in Gujarati, "Kai na kar. Taxnu figure out karvanu che," which translates to "Don't do anything.  Tax figure has to be declared."

137.   Ammar responded to the February 8, 2018 text, "Ok."

138.   On or about February 11, 2018, Pithapurwala, using Alifiya's phone, texted Ammar four links that he labelled "useful," including a "bullish" tweet about Snap, a "[p]ossible sell rumor," and a February 5, 2018 article that listed Snap as one of "5 high-risk, high-reward stocks to buy on the stock market's dive."

139.   Ammar responded to the February 11, 2018 text, "Good links saved everything.  Thanks."

140.   Defendants' communications on February 11, 2018 reflect an attempt to manufacture a fictitious reason for Ammar's trading, to conceal their insider trading.

141.   On or about February 13, 2018, Pithapurwala, using Alifiya's phone, texted Ammar links to two legal articles about insider trading.

142.   Ammar responded to the February 13, 2018 text: "Dude first thing first. I am still getting mail directly from SNAP to my address.  Just received something from your payroll!!"

143.   On or about February 15, 2018, Ammar sent three texts to Pithapurwala:

We are Momar PK

Stockplaymomar@gmail.com

Insidertrader

Pithapurwala replied on the same day, "Lol That's a very well thought out name."

144.   In or around October 2018, Ammar emailed brokerage statements showing the profits from the Snap trading to Alifiya's email address.

145.    The statements were intended for Pithapurwala, who had access to Alifiya's email.

## J.    Pithapurwala Possessed Material Non-Public Information

146.   Pithapurwala possessed material non-public information about Snap's fourth quarter and year-end 2017 financial results, and based on that information, he asked Ammar to purchase Snap securities.

147.   Pithapurwala's possession of material non-public information and tip to Ammar is demonstrated by:  (1) Ammar's suspiciously-timed trading; (2) Pithapurwala's and Alifiya's rapid sequence of withdrawals, deposits and transfers through numerous intermediaries; (3) Ammar's highly unusual trading in out-of-the money, soon-to-expire options by a trader with no history of making those kinds of trades; (4) defendants' concerted concealment of their conduct, including; the attempt to manufacture a non-incriminating explanation for the trades after-the-fact; and their post-trading research on insider trading law.

## K.    Pithapurwala and Ammar Acted With Scienter

148.   Pithapurwala knew, or was reckless in not knowing, that he owed Snap and its shareholders a duty not to use Snap's confidential information, including financial information, except as permitted under the confidentiality agreement that he signed and acknowledged.

149.   Pithapurwala knew, or was reckless in not knowing, that he was prohibited from purchasing Snap securities during the blackout period that was in

effect from December 9, 2017 through February 8, 2018.  He had previously completed training on Snap's insider trading policy and he received at least four emails between October 2017 and January 2018 regarding the blackout period, and reminders of Snap's insider trading policy.

150.   Pithapurwala asked Ammar to purchase Snap securities ahead of the Snap's February 2018 earnings release because he knew that he was forbidden from doing so himself.

151.   Pithapurwala knew, or was reckless in not knowing, that the pre-earnings information to which he gained access in January 2018 was material and non-public.  The confidentiality agreement that he previously signed specified that financial results, among other things, were confidential information.  Snap's insider trading policy included "financial results or forecasts" among a "non-exhaustive" list of examples of material non-public information.

152.   Pithapurwala knew, or was reckless in not knowing, that he breached the duties of trust and confidence that he owed to Snap and its shareholders by tipping Ammar.  Snap's insider trading policy, of which Pithapurwala was aware, stated that anyone with inside information could not advise anyone else to trade the company's securities or "communicate the information to anyone else until you know that the information has been publicly disseminated."  Additionally, an appendix of "Frequently Asked Questions" warned that telling someone else to buy Snap securities while in possession of inside information, even without sharing any material non-public information itself, "is still tipping, and you can still be responsible for insider trading.  You should not recommend to another person that they buy, hold, or sell our common stock or any derivative security related to our common stock, since that could be a form of tipping."

153.   Pithapurwala knew that Ammar would trade on the basis of the material non-public information.  He specifically asked Ammar to purchase Snap securities, researched the Snap options available to purchase, and was on the phone with Ammar

while Ammar placed some of the trades.

154.   Pithapurwala attempted to conceal that he tipped Ammar by:  (1) sending the funds to Ammar in a circuitous manner; and (2) using his wife Alifiya's phone to communicate with Ammar, thereby creating no record of phone calls between the two men.

155.   Pithapurwala attempted to manufacture a false rationale for the Snap option purchases after the fact.

156.   Pithapurwala received a personal benefit from his tip to Ammar, including but not limited to the benefit of providing a gift of confidential information to his brother-in-law and good friend with the knowledge and expectation that Ammar would trade on it.

157.   Additionally, Pithapurwala stood to obtain a pecuniary benefit from the tip because he and Ammar agreed to share the profits from Ammar's Snap trading.

158.   Ammar knew, should have known, consciously avoided knowing, or was reckless in not knowing that Pithapurwala breached a duty to Snap by tipping him in exchange for a personal benefit.

159.   Ammar attempted to conceal the source of the funds he used to purchase Snap options.

160.   After his trades, Ammar thanked Pithapurwala for sending "[g]ood links" to help manufacture a post hoc justification for the trades; expressed concern that he was still receiving Pithapurwala's mail from Snap at his address; and nicknamed Pithapurwala and himself "Insidertrader."

161.   Ammar knew or should have known that Pithapurwala received a personal benefit from the tip because he knew that Pithapurwala, his brother-in-law and close friend, was gifting him confidential information with the expectation that he would trade on it.

162.   Ammar knew or should have known that Pithapurwala expected to benefit financially from the trading because he and Pithapurwala agreed to share the

profits.

### L.   Alifiya Knowingly or Recklessly Facilitated and Helped Conceal the Unlawful Trading

163.   Alifiya knowingly and/or recklessly provided substantial assistance to Pithapurwala and Ammar in their commission of insider trading.

164.   Alifiya knew that Pithapurwala asked Ammar to purchase Snap securities because her husband could not do so himself during the blackout period.

165.   Alifiya knew that Pithapurwala did not want to be associated with the transfers to Ammar or Ammar's Snap trading because of Snap's blackout restriction.

166.   Alifiya substantially assisted Pithapurwala and Ammar in their commission of insider trading by (1) helping to conceal and disguise the trading by facilitating the transfer of $20,000 to Ammar's trading account through a web of intermediaries; and (2) obscuring Pithapurwala's direct communications with Ammar by acting as their go-between.

167.   Alifiya attempted to conceal the link between Pithapurwala and Ammar and to disguise the purpose of the transfers.  After accompanying Pithapurwala to make cash withdrawals from his sole account and their joint account, Alifiya deposited $21,700 cash into her separate account – making two deposits at different locations two hours apart – and instituted multiple wire transfers to Mr. A and his friend.

168.   Alifiya knew that at least $10,000 of the funds she transferred was intended for Ammar to purchase Snap securities.  She knew that the funds needed to reach Ammar quickly, so she made same-day transfers and paid the additional fee associated with them.  She made two of the transfers during a last-minute, one-day trip to the Bay Area, knowing the funds had to reach Ammar quickly.

169.   Pithapurwala's request that Ammar purchase Snap securities during the blackout period, the urgency of the transfers, their circuitous nature, and Pithapurwala's expressed intent to hide his connection to the transfers and Ammar's

Snap trading were red flags about the illicit nature of the conduct.

170.    Given what Alifiya knew, a reasonable person would have questioned whether Pithapurwala possessed material non-public information about Snap.  Alifiya knew or consciously avoided inquiring into whether her husband had unlawfully tipped Ammar.

171.    At a minimum, Alifiya acted recklessly.  The wrongful nature of Pithapurwala's conduct was so obvious that Alifiya must have been aware of it, or if she was not, it was only because she consciously avoided inquiring further.

172.    Alifiya substantially assisted Pithapurwala's and Ammar's unlawful trading by depositing cash into her sole account, transferring funds to Mr. A that were intended for Ammar to use for purchasing Snap securities, and allowing Pithapurwala to communicate with Ammar about the trading using her phone.  Alifiya played an instrumental role in funding the trading, particularly given that Ammar was unemployed and had no other significant source of funds.  Her conduct facilitated Pithapurwala's and Ammar's fraud and helped to conceal it.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (against Defendants Pithapurwala and Ammar Kutiyanawalla)

173.    The SEC re-alleges and incorporates by reference paragraphs 1 through 172 above.

174.    As set forth above, defendant Pithapurwala, acting with scienter, tipped defendant Kutiyanawalla by disclosing material, non-public information in violation of his duty of confidentiality to Snap, for personal benefit.  Defendant Ammar Kutiyanawalla purchased Snap call options on February 5 and 6, 2018 on the basis of Pithapurwala's tip, and knew, should have known, consciously avoided knowing, or was reckless in not knowing that the information he received from Pithapurwala was disclosed in breach of a duty of trust and confidence and for personal benefit.

175.    By engaging in the conduct described above, defendants Pithapurwala

and Ammar Kutiyanawalla, and each of them, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

176.   In engaging in the conduct described above, defendants Pithapurwala and Ammar Kutiyanawalla acted knowingly or recklessly.

177.   By engaging in the conduct described above, defendants Pithapurwala and Ammar Kutiyanawalla violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a)-(c) thereunder, 17 C.F.R. §§ 240.10b-5(a)-(c).

### SECOND CLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 10(b)**

**of the Exchange Act and Rule 10b-5**

**(against Defendant Alifiya Kutiyanawalla)**

178.   The SEC re-alleges and incorporates by reference paragraphs 1 through 177 above.

179.   As set forth above, defendant Alifiya Kutiyanawalla knew, consciously avoided knowing, or was reckless in not knowing that Pithapurwala tipped material non-public information to Ammar Kutiyanawalla.  She helped to facilitate and conceal the fraud by depositing cash into her separate account, transferring funds to Ammar that she knew would be used to purchase Snap securities based on Pithapurwala's tip, and allowing Pithapurwala to communicate with Ammar about the tip and the Snap trading using her phone.

180.   By engaging in the conduct described above, defendant Alifiya

Kutiyanawalla, directly or indirectly, knowingly or recklessly provided substantial assistance to Pithapurwala and Ammar Kutiyanawalla in their violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

181.   By engaging in the conduct described above, Defendant Alifiya Kutiyanawalla aided and abetted, and unless restrained and enjoined, will continue to aid and abet, violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a)-(c) thereunder, 17 C.F.R. §§ 240.10b-5(a)-(c).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Mohammed Pithapurwala, Ammar Kutiyanawalla, and Alifiya Kutiyanawalla, and those persons in active concert or participation with any of them who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Exchange Act Section 10(b) [15 U.S.C. §§ 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

### III.

Order Defendant Ammar Kutiyanawalla to disgorge all funds received from his illegal conduct, together with prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

### IV.

Order Defendants Mohammed Pithapurwala and Ammar Kutiyanawalla to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1].

### V.

Order Defendant Alifiya Kutiyanawalla to pay a civil penalty pursuant to

Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  December 3, 2021

*Amy Jane Longo*
Lynn M. Dean
Amy J. Longo
Colleen M. Keating
Attorney for Plaintiff
Securities and Exchange Commission